## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

KENNETH HALL,

        Plaintiff,                     Civil Action No. 22-cv-11741
                                       HON. BERNARD A. FRIEDMAN

v.

COUNTY OF MACOMB JAIL, *et al.*,

        Defendants.

_____/

### OPINION AND ORDER GRANTING DEFENDANTS'
### MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a motion for summary judgment filed by

defendants Macomb County, Sgt. Hurley, Deputy Manzella, Deputy Thome,

Deputy Gross, Deputy Morales, and Deputy White.[1]   (ECF No. 22).   Plaintiff

Kenneth Hall has filed a response in opposition.  (ECF No. 25).   Defendants have

replied.  (ECF No. 26).   The Court does not believe that oral argument will aid in

the resolution of this motion and shall not hold a hearing.   E.D. Mich. LR 7.1(f).

For the reasons that follow, the motion is granted.

---

[1] The caption of the amended complaint could be read to list County of Macomb
Jail and Macomb County as separate defendants, but the list of parties within the
amended complaint appears to merge the entities.  (ECF No. 12, PageID.68-69,
72). The Court will treat the County of Macomb Jail and Macomb County as a
single defendant.   Further, the Court understands that the motion is brought on
behalf of all defendants in this case.

I.   Background

The operative amended complaint in this matter alleges that plaintiff Hall's rights were violated while he was an inmate at the Macomb County Jail.  (ECF No. 12).  He asserts that on or around October 23, 2020,[2] he did not comply with a lock down order and instead "sat defiantly but peaceably on a staircase within the jail." (*Id.*, PageID.70).  According to the complaint, defendant Hurley activated the CERT[3] team, consisting of the individual defendants and other members, to respond to the situation.  (*Id.*).  Hall alleges that the CERT team ordered him to walk backwards towards a doorway where at least seven officers in riot gear were waiting, and that he complied.  (*Id.*).  Nevertheless, he asserts that the "Defendants on the CERT team forcefully grabbed him and threw him to the ground, whereupon they shot him with a taser gun then physically assaulted him while he was on the ground and fully compliant."  (*Id.*).  Hall says that he "was shot with the taser gun again while he was on the ground, fully compliant and with multiple officers on top of him."  (*Id.*).  Hall alleges that defendant Thome operated the taser.  (*Id.*).  He further asserts that although he did not ever "threaten any officers or give any officers reason to believe they were at risk of immediate harm," the

---

[2] While the complaint refers to October 23, 2020, (ECF No. 12, PageID.70), the motion and response refer to October 22, 2020, (ECF No. 22, PageID.112); (ECF No. 25, PageID.507).  The date is immaterial to the resolution of this motion.
[3] Corrections Emergency Response Team.

defendants use "excessive" force against him, which he says has caused "injuries, including an orbital fracture and emotional distress." (*Id.*, PageID.70-71).

The complaint includes one cause of action against the individual defendants under 42 U.S.C. § 1983 for violation of the 4th, 8th, and 14th Amendments. (*Id.*, PageID.71-72). Count I asserts that in violation of Hall's rights the individual defendants used force that "was objectively unreasonable and excessive in light of the circumstances." (*Id.*, PageID.71). The complaint also includes one cause of action for *Monell*[4] liability under 42 U.S.C. § 1983 against defendant Macomb County. (*Id.*, PageID.71-73). Count II asserts that the aforementioned deprivation of Hall's rights was "caused by a series of deliberately indifferent policies, customs, and established practices, including inadequate training, by the County of Macomb." (*Id.*, PageID.73).

Defendants have now filed the instant motion for summary judgment urging that the entire incident was captured on video and conclusively demonstrates that they acted in an objectively reasonable manner. (ECF No. 22).

## II.   Legal Standard

A moving party is entitled to summary judgment if it can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All of the evidence, along with all

---

[4] *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).

reasonable inferences, must be viewed in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Id.* (cleaned up).

III.   Analysis

Here, defendants urge that they are entitled to qualified immunity on Hall's excessive force claim because no reasonable jury could view the evidence and find that the force used was objectively unreasonable.   (ECF No. 22, PageID.125). They urge that his *Monell* claim against the County likewise fails because he cannot establish any underlying constitutional violation.   (*Id.*, PageID.135). Defendants also argue that the *Monell* claim fails because Hall has no evidence to prove any unconstitutional custom, practice, or policy that caused a violation of his rights. (*Id.*, PageID.136).

> *A. Summary judgment is warranted as to Count I because the officers' use of force was not objectively excessive or unreasonable and because the officers did not violate a clearly established right.*

The individual defendants urge that they are entitled to qualified immunity on Hall's excessive force claim (Count I).

> The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  Qualified immunity

4

balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (cleaned up).  When invoked by a defendant, the plaintiff bears the ultimate burden to show that the defendant is not entitled to qualified immunity.  *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

"[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established."  *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011).  The Court has discretion to decide which of the two prongs to analyze first.  *Pearson*, 555 U.S. at 236.

Generally, when considering an assertion of qualified immunity at the summary judgment stage, the Court should view the evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  But "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Id.*  Rather, where there is video evidence of the incident in question, and one party's version of events presents a "visible fiction," the Court

5

should view "the facts in the light depicted by the videotape." *Id.* at 380-81; *see also Bailey v. Ann Arbor*, 860 F.3d 382, 386-87 (6th Cir. 2017) (where "no reasonable jury could watch the video and agree" with the plaintiff, and the video "utterly discredits" plaintiff's version of events, the Court may "ignore the visible fiction in his complaint," even at the motion to dismiss stage) (cleaned up).  The *Scott* exception, however, is narrow and limited to "blatantly contradicted facts." *Kindl v. City of Berkley*, 798 F.3d 391, 399 (6th Cir. 2015) (cleaned up).

Count I alleges that the individual defendants used objectively excessive and unreasonable force against Hall in light of all the circumstances.  (ECF No. 12, PageID.71).  But based on the evidence, no reasonable jury could find that the use of force was excessive or unreasonable.

Both sides agree with the following general statement of relevant facts.  Hall entered the Macomb County Jail on September 23, 2020, as a pretrial detainee held on misdemeanor charges.  Shortly thereafter, he had an altercation with a fellow inmate that resulted in his reclassification as a security risk with limited time outside of his cell.  Later, on October 17, 2020, Hall had an altercation with Deputy Parker Wagner.[5]  The use of force incident that is the subject of this lawsuit occurred on or around October 22, 2020.  On that day, Hall defiantly sat on the stairs outside of his cell, and defendant Hurley activated the CERT team.  Hall was

---

[5] Wagner is not a defendant in this action.

ordered to come down the stairs, he ultimately did so, and he was then restrained by members of the CERT team. *See* (ECF No. 22, PageID.118-124); (ECF No. 25, PageID.515-17) (identifying these as the "relevant facts").

The parties disagree as to the contextualization of these facts, but the record – including video evidence and Hall's own testimony – speaks for itself. As to his first incident, Hall testified at his deposition that shortly after arriving at the jail, he was involved in "an altercation" with another inmate when he saw the man come out of the shower naked and "didn't like it" and "didn't feel like that was something that [he] should be seeing." (ECF No. 22-2, PageID.181-82). Hall admitted that he struck the other inmate, was written up, and was ultimately given a high classification level of security, meaning that he was put on lock-down for 23 hours a day as a possible threat to other inmates. (*Id.* at 183-86).

The October 17, 2020, incident was captured on video. In his brief, Hall characterizes this as a "non-violent exchange with Deputy Parker Wagner," (ECF No. 25, PageID.515), and likewise testified at his deposition that he was upset that Wagner had addressed him with profanity while he was on the phone with his family but that the two had merely "had a couple words and that was it," (ECF No. 22-2, PageID.189).[6] His brief urges that "Hall did not hurt or attempt to hurt

---

[6] Upon being presented with the video, however, Hall admitted that he threatened "to beat the fuck out of the guard." (*Id.*, PageID.196).

Wagner," suggests that "[t]here was no risk of imminent harm," and notes that he "returned to his cell without issue." (ECF No. 25, PageID.515).

But the video evidence, to which both Hall and defendants draw the Court's attention, paints a vastly different picture such that no reasonable jury could accept Hall's sanitized version of the incident. *See* (ECF No. 22-7) (Exhibit 6).[7] Hall is initially seen seated and speaking on the telephone. He requests a bar of soap, and a deputy instructs him to put his request into a kite. (ECF No. 28-1, PageID.748) (Exhibit 6a). Hall says that he's already done so, and then begins addressing the deputy with profanity. (*Id.*). The deputy instructs him to "back the fuck up" and Hall tells the deputy not to touch him. (*Id.*). Although the officer eventually apologizes for his own use of profanity, Hall is relentless in his tirade. (*Id.*, PageID.750). Hall challenges the deputy to "lock me down. You lock me down" and threatens that he "will beat the fuck out of [the deputy]." (*Id.*, PageID.749). Saying "Man, I will beat you, boy," Hall asserts that he doesn't "give a fuck" and that the deputy doesn't "know where the fuck I'm from." (*Id.*). Later he threatens "I catch your ass out, I'll beat the dog shit out of your punk ass. I swear to god, little pussy." (*Id.*, PageID.750). And then at the end: "No way somebody talk to me like that on the streets. I'm going to fucking whomp your ass. Pussy. Pussy."

---

[7] Defendants have provided a transcript of three of the videos, at Exhibits 6a, 8a, and 13a. (ECF No. 28). Hall has not challenged the accuracy of the transcripts or otherwise objected to their use. The record should reflect that the Court reviewed the videos and also relied upon the transcripts.

(*Id.*, PageID.753).  From his initial seated position, the video shows him rising and approaching the deputy.  After a few paces back and forth he later slams his hand onto the table to emphasize his threat to "beat the fuck" out of the deputy.  It appears that he remains within a few feet of the deputy during the entirety of the heated exchange.  *See generally* (ECF No. 22-7) (Exhibit 6); *see also* (ECF No. 22-2, PageID.194) (deposition testimony of Hall that he got to within a foot of Wagner).

Although the video does not display any physical contact between the men, it clearly shows Hall aggressively approaching the deputy and threatening him multiple times during this incident.  Hall himself admitted that he acted aggressively.  (ECF No. 22-2, PageID.189) ("I asked him a question and then he began cussing at me and then that's when I became aggressive toward him").[8]

There is also video evidence of the incident that is the subject of this lawsuit. Again, it clearly and substantially differs from Hall's take on the situation, so much so that his version is rendered a visible fiction.

Hall's brief says that he "was sitting peacefully but defiantly on the stairs outside his cell" when defendant Hurley "was notified and activated the CERT

---

[8] And contrary to Hall's assertion that the incident "is clearly being used in an improper attempt to prejudice this Court," (ECF No. 25, PageID.515), as will be discussed more fully below, the Court finds these earlier incidents relevant to the context in which defendants approached Hall on the date of the incident that is the subject of this case.

team to remove Hall from the unit." (ECF No. 25, PageID.515). He says he was still seated when the CERT team arrived and someone began shouting at him. (*Id.*, PageID.516). Hall says that "once he understood the orders to stand and come down the steps he complied" and that as directed he walked backwards towards the door with his hands behind his back. (*Id.*). He says he was then "grabbed and roughly maneuvered by the officers and brought roughly to the ground, where he was tased multiple times." (*Id.*). Hall asserts that while on the ground he "felt a strong force to his face, which he assumed was a knee or foot, which resulted in a broken orbital bone." (*Id.*). He claims that "[a]t no point is Hall ever fully turned towards officers with his hands raised in a 'fighting stance.'" (*Id.*, PageID.517). He urges that "even in the screenshot used in Defendants' brief to attempt to show that Hall 'might have tried to swing on an officer,' it is clear that Hall is fully restrained by multiple deputies." (*Id.*). He says that he "was very quickly restrained, handcuffed while on the ground, and moved to the restraint chair" and urges that no officers were harmed. (*Id.*).

Noting that the entire incident occurred in mere seconds, Hall's brief urges that "watching the video at any speed confirms Hall's testimony about what happened." (*Id.*, PageID.516). Turning, then, to his testimony.

Hall testified at his deposition that initially, he "couldn't actually hear" the officers' instructions because they were wearing masks. (ECF No. 22-2,

PageID.206).  As for why he was sitting on the stairs in the first place, he said he "just wanted to, you know, talk to a sarge and see why [he] didn't go to court." (*Id.*).  Hall indicated that he "followed [the officer's] instructions, and once [he] got out the door, they grabbed [him] and started pulling [him] and threw [him] on the ground."  (*Id.*).[9]  He said that, as instructed, he walked backwards and that when he reached the officers they "grabbed" him and "threw [him] to the ground." (*Id.*, PageID.208).  Hall testified that he "was tased when [he] was already on the ground" and estimated that he was tased "probably about three or four different times."  (*Id.*).  Hall denied that after being told not to move he whirled around with his fists clenched and stated that his "hands were behind [his] back" and that he "never actually spinned around or anything."  (*Id.*, PageID.208-09).  He also said that "[e]ven when [he] hit the ground, [his] hands were still behind [his] back." (*Id.*, PageID.209).  Hall testified that he was "[l]ike instantly" tased after hitting the ground, at which point he was "kicked and basically, you know, just got beat, beat up real bad."  (*Id.*, PageID.209-10).  Hall didn't know who kicked him, but asserted that it "was actually like a knee to the face" or "a knee strike that actually

---

[9] Hall explained the white towel wrapped around his waist under his clothing by saying that he "had just got out the shower."  (*Id.*, PageID.209).  Defendants, by contrast, call this a "prefight indicator" and urge that "inmates wrap themselves in towels . . . as a defense tactic to prevent the taser probes from making contact with their skin."  (ECF No. 22, PageID.123).  The Court declines to speculate either way as to *why* Hall had the towel around his waist.

broke [his] cheekbone." (*Id.*, PageID.210). He denied being punched but repeated that he had been "kicked in the face." (*Id.*). Hall testified that after being kicked, he "turned [his] face and [he] was tased like two or three more times." (*Id.*, PageID.211). He said that the officers put the cuffs on him, then took them off, and then put him in a chair, at which point an officer "was choking [Hall]." (*Id.*). Hall could not identify the officer who he said was choking him but said it was "like by the bottom of [his] face, like on [his] cheekbones." (*Id.*, PageID.211-12). Hall acknowledged that the officers placed a spit hood on his head and said that after he was secured in the chair he was evaluated by a nurse. (*Id.*, PageID.212). Although he did not complain about anything because he was "just in shock," Hall testified that he "couldn't feel like [his] face" and that he "was sweating real bad" and "felt like [he] was about to die." (*Id.*, PageID.212-13). Hall said that during the ordeal the officers ordered him to open his hands, but that he couldn't "because [he] was being tased." (*Id.*, PageID.214).

Both parties direct the Court's attention to the videos of the incident. *See* (ECF Nos. 22-9, 22-14, 22-15) (Exhibits 8, 13, 14). Watching them, together with the transcripts, the Court concludes that no reasonable jury could believe Hall's testimony that he was kicked, that he was beaten up, that he was tased more than twice, that he did not spin on the defendants, that his arms were always behind his back, and that he didn't have his hands balled up into fists. He was quickly and

efficiently restrained by the deputies, but he was not a peaceful participant in the incident and no excessive force was used.

Begin with the footage showing his initial refusal to lock down. (ECF No. 22-9) (Exhibit 8); (ECF No. 28-2) (Exhibit 8a). Hall starts by inquiring of the deputy "[w]hy aint you taking me to court, mother fucker. You supposed to take me to court." (ECF No. 28-2, PageID.759). The deputy tells Hall that court is not on his shift and he has nothing to do with court, but Hall says he doesn't care. (*Id.*). A deputy asks Hall if he is going to lock down, but Hall responds by saying "[y]ou done fucked it up. Now I need to go to court. Take me to court." (*Id.*). A deputy gives the order to "call booking command, let them know we got a guy refusing to lock down." (*Id.*). Another deputy says to Hall: "[w]e can do it this way but the way I'm asking you to do it, to lock down, it's a lot easier to get done." (*Id.*, PageID.759-60). Hall will not be dissuaded, however, and says "I don't give a fuck. I don't like easy, I like hard. That's what's up." (*Id.*, PageID.760). The video confirms: Hall was given a chance to peacefully lock down but he rejected all opportunities to comply, instead saying "I don't like easy, I like hard." *See generally* (ECF No. 22-9).

Turn next to the handheld camera that captured the following minutes, after the CERT team was activated. (ECF No. 22-14) (Exhibit 13); (ECF No. 28-3) (Exhibit 13a). The officers repeatedly tell Hall to "[g]et off the stairs" and to

"[l]ock down." (ECF No. 28-3, PageID.765). Hall responds "[w]hat you say –" and then the officers advise him that if he doesn't get off the stairs, he will be pepper sprayed. (*Id.*). Hall can apparently understand them at that point and the video shows him beginning to walk down the stairs. (ECF No. 22-14 at 00:30-40). At that point, the CERT team orders him to "[t]urn around" and to put his hands behind his back. (ECF No. 28-3, PageID.765). Hall puts his hands behind his back and complies with the order to walk backwards towards the officers. (ECF No. 22-14 at 00:40-53). As he reaches the door where the officers stand, his back facing them, they warn him "[d]on't turn around or you're going to get tazed." (ECF No. 28-3, PageID.765). But Hall turns around, and, as forewarned, is tazed. (ECF No. 22-14 at 00:57-1:00).[10] He falls to the ground. (*Id.* at 1:00). His head brushes against the leg of one of the officers on his way down. (*Id.*). The CERT team tells him not to move or he'll be tazed again. (ECF No. 28-3, PageID.765). They continue to struggle, and he is tazed again. (ECF No. 22-14 at 1:22-26). He is put into handcuffs and transferred to the restraint chair. (*Id.* at 1:33-3:09). While he is being secured in the chair, an officer holds his head against the headrest, chin up with the officer's fingers just under the jawbone. (*Id.* at 3:10-4:05). A nurse approaches to check his restraints, the nurse gives a thumbs-up, and then Hall is taken up to a cell. (*Id.* at 4:26-6:36).

---

[10] Notably, before Hall is tazed the first time, the video shows his hands balled up into fists. (ECF No. 22-14 at 00:58-59).

14

Contrary to Hall's testimony, he wasn't thrown to the ground. Rather, the officers warned him he would be tazed if he turned around; he turned around; he was tazed; and he fell. His hands were balled up *before* he was tazed, and there is no evidence of anyone kicking him. He wasn't choked but was held, chin up, against the chair while being restrained.

Finally, look at the body camera worn by defendant Hurley. (ECF No. 22-15) (Exhibit 14).[11] This angle provides a very clear perspective of the officers warning Hall that if he turned around he would be tazed, followed almost immediately by Hall turning around and then being tazed. (*Id.* at 3:21-28). It also gives a clear view of how the officer held Hall's head against the chair and shows that while he was initially being seated another officer briefly placed his hands on Hall's upper chest. (*Id.* at 5:38-43). Again, however, the video does *not* show Hall with his hands behind his back for the entire incident, any officer kicking Hall, anyone tazing him more than twice, or anyone choking him.

The video evidence blatantly contradicts his testimony, and so the Court follows the Supreme Court's admonition in *Scott* to view the evidence in the light presented by the videotape. *Scott*, 550 U.S. at 380-81.

Hall objects to reliance on the videos and analogizes to *Day v. Suburban Mobility Authority for Regional Transportation*, No. 356848, 2022 WL 7724078

---

[11] No transcript was provided for this video.

(Mich. Ct. App. Oct. 13, 2022), in which the Michigan Court of Appeals declined to apply *Scott*.  (ECF No. 25, PageID.523-25).  But in *Day*, the court found that parts of the video recording were ambiguous and noted that one of the key questions was what the drivers could have seen, a question that could not be answered by a video with low resolution and artificially increased illumination. *See Day*, 2022 WL 7724078, at *2, 6.  Here, by contrast, the videos are clear, there is no indication that they have been artificially altered in any way, and what can be seen on the videos conclusively demonstrates that the officers did not act with excessive force.

Hall also urges that the videos cannot be completely trusted because the views are partially obstructed.  (ECF No. 25, PageID.526).  The Court agrees that under certain circumstances, an obstructed or single-angle video may be insufficient to conclusively determine the facts such that no reasonable juror could debate them.  *See, e.g.*, *Sevy v. Barach*, 815 F. App'x 58, 61-62 (Mem) (6th Cir. 2020). But here, there are *two* video cameras that capture the *entire* incident, and any obstructions caused by the moving bodies are brief.  This is not a situation, as in *Sevy v. Barach*, 815 F. App'x 58, (Mem) (6th Cir. 2020), where a stationary obstruction blocks part of the view for the whole video and the video only captures part of the alleged violation of rights.  *Id.* at 59.

16

More broadly, Hall argues that a jury "could easily view the video and find that Hall did not demonstrate active resistance or threaten the officer's safety." (ECF No. 25, PageID.523). The Court fundamentally disagrees. Due to an altercation with another inmate, Hall had already been classified as a high-security inmate and was allowed only one hour outside of his cell per day because of the risk he posed to others. On another occasion, after disobeying multiple orders to lock down, he repeatedly threatened a deputy, including approaching the deputy and pounding on the table, and Hall himself characterized his behavior at that time as "aggressive." Hall's refusal to follow orders and aggression towards other inmates and staff had already earned him a security classification *before* the incident that is the subject of this lawsuit.

On the day that this incident occurred, Hall was seated on the stairs and was initially physically distant from the officers. But he was also refusing direct orders to return to his cell, as he had in the past. When informed that continued recalcitrance would result in more drastic measures being taken to ensure compliance, Hall did not adjust his behavior, but issued a challenge, saying that he preferred it the hard way. After the CERT team was activated, and several additional orders were issued, Hall eventually came down the stairs and approached the officers backwards as directed. But when clearly warned that any attempt to turn around would result in him being tased, Hall again failed to follow

directions. The video clearly shows him turning towards the officers and moving his arms from the back of his body to the front, fists clenched. He was tased and did fall to the floor, but there is no indication at all that anyone kicked him or otherwise beat him up. After struggling on the floor, he was tased a second time and then ultimately transferred into the restraint chair. Again: the video clearly shows that his head was secured against the back of the chair but does not show that he was ever choked. Hall offered extensive resistance to the officers' orders, even ignoring the moments when he asserts that he could not hear them because of their masks. And he definitively threatened the officers' safety. Most obviously, this high-security inmate was told in no uncertain terms not to turn around, but the video shows him clearly turning towards the officers, hands balled into fists.

The Court is persuaded that no reasonable jury could view the officers' conduct as constituting excessive force under the totality of the circumstances. Tasked with maintaining order and protecting other inmates and staff, they used reasonable and appropriate means to gain compliance.

The Supreme Court has recognized, in the pretrial detainee context, that a claim of excessive force must "account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain

institutional security." *Kingsley v. Henrickson*, 576 U.S. 389, 397 (2015) (cleaned

up).   And a non-exhaustive list of considerations on that front includes the need

for force balanced against the amount of force, the extent of a plaintiff's injury,

any effort made to limit the amount of force, the severity of the security problem,

the threat reasonably perceived by the officer, and any active resistance from the

plaintiff.  *Id.*  Here several of the considerations lead to the conclusion that the

force used in this case was not excessive.  Hall was given multiple opportunities to

peacefully return to his cell but rejected them all, instead defying the officers'

orders and failing to follow clear instructions not to turn around.  He was already

classified as a high-security inmate and was continuing a trend of noncompliance

and overt defiance.

The Sixth Circuit, in a slightly different context, has likewise emphasized

that "[i]nmates cannot be permitted to decide which orders they will obey, and

when they will obey them.   Someone must exercise authority and control."

*Caldwell v. Moore*, 968 F.2d 595, 601 (6th Cir. 1992) (cleaned up).  Approving of

the use of both a stun gun and a straight jacket to subdue an inmate that refused to

be quiet, the court noted that the plaintiff there, like Hall here, "had already

demonstrated a propensity for violence by fighting with other inmates" and that

"[t]his was the reason he was placed in the isolation cell."  *Id.*  The Sixth Circuit

rejected the plaintiff's contention that there were other alternatives available to

gain compliance as they all either allowed the inmate to determine if and when to comply with orders or required the officials to enter the inmate's cell to subdue them. *Id.* at 602. "It is not unreasonable for the jail officials to conclude that the use of a stun gun is less dangerous for all involved than a hand to hand confrontation." *Id.*

Because the video evidence undeniably refutes Hall's claim that he was kicked, beaten, thrown to the ground, or choked, the only use of force at all in this incident was the deployment of the taser. Hall was first tased when, after being instructed not to turn around, he attempted to turn with balled fists towards the officers. This did not occur against a blank canvas but followed Hall's assault of another inmate (which resulted in his designation for high security) and his earlier altercation with Deputy Wagner. After he had already escalated the instant situation by refusing orders to lock down and informing the officer that he wanted to do things the "hard" way, Hall blatantly defied the officers' clear orders not to turn around. The officer did not act unreasonably or with excessive force in deploying the taser to subdue Hall who was actively resisting orders. *See, e.g.*, *Rudlaff v. Gillispie*, 791 F.3d 638, 641 (6th Cir. 2015) (not excessive force to use a taser on someone who is physically struggling with, threatening, or disobeying officers); *Hanson v. Madison Cty. Det. Ctr.*, 736 F. App'x 521, 531 (6th Cir. 2018) ("Active resistance to an officer's command can legitimize even higher levels of

force, such as an officer's use of a Taser.  Such resistance can take the form of verbal hostility or a deliberate act of defiance.") (cleaned up).   Furthermore, when Hall spun on the officers, the video clearly shows his fists balled up.  Even if Hall was not in fact intending to strike the officers, under these circumstances the officers' use of the taser to subdue him was not excessive.  *See Thomas v. City of Columbus*, 854 F.3d 361, 367 (6th Cir. 2017) (the use of even *deadly* force was not unreasonable "even if facts beyond [officer's] knowledge meant that he actually faced no threat").

Hall was tased for the second time while he was on the ground and the deputies were struggling to handcuff him.  Again, however, the law clearly permits officers to utilize a taser to subdue inmates offering active resistance, including a refusal to be handcuffed.  *See, e.g.*, *Rudlaff*, 791 F.3d at 641 ("Our cases firmly establish that it is not excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest.  Active resistance includes 'physically struggling with, threatening, or disobeying officers'"; resistance also includes "refusing to move your hands for the police to handcuff you, at least if that inaction is coupled with other acts of defiance.") (cleaned up); *Hagans v. Franklin Cty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (officers may use a taser to subdue an individual actively resisting arrest and refusing to be handcuffed).   The video shows that while on the ground, Hall continued to

21

physically struggle against the officers and resisted efforts to handcuff him. The second deployment of the taser, accordingly, did not constitute excessive force.

It is said that a picture is worth a thousand words. Here we have not just photographs but *multiple videos* that clearly detail what happened in this case. The picture they paint fundamentally undermines Hall's version of events: no reasonable jury could watch the videos and believe his story.

Moreover, nor does the Court find that Hall has satisfied the second prong of the qualified immunity test as he has not demonstrated that the defendants' conduct violated "clearly established law." *Bishop*, 636 F.3d at 765.

> A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right. We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up).

The reference in Hall's brief to *Anderson v. Creighton*, 483 U.S. 635 (1987), in support of a broader conception what constitutes a "clearly established right" fundamentally misreads that case. *See* (ECF No. 25, PageID.521) (citing *Anderson*, 483 U.S. at 639) ("As stated by the United States Supreme Court in *Anderson*, any action which violates a Constitutional provision violates a clearly established right, no matter how unclear it may be that the particular action is a

violation."); *see also* (*id.*, PageID.520) (similarly misunderstanding *Anderson*).

The cited passage in *Anderson* actually comes to the opposite conclusion:

> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. Much the same could be said of any other constitutional or statutory violation. But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of *Harlow.* Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights. *Harlow* would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties, by making it impossible for officials reasonably to anticipate when their conduct may give rise to liability for damages. It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson*, 483 U.S. at 639-40 (cleaned up).

Here, Hall has given the Court no caselaw or statute that would suggest "that every reasonable official would have understood" that what the defendant officers

were doing violated Hall's rights. *al-Kidd*, 563 U.S. at 741 (cleaned up). He instead urges at a broad level of generality that individuals have a right to be free from excessive police force, that the Court should consider whether the officers' actions were objectively reasonable, and that the Court should consider several factors in determining reasonableness. (ECF No. 25, PageID.521-22). While he wasn't required to produce a case directly on point, he was required (but failed) to identify some precedent that would "have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741 (cleaned up).

By contrast, defendants have identified multiple cases from the Sixth Circuit in different but analogous contexts concluding that the police may use force, including a taser, when an individual resists arrest, and that a stun gun may be used to subdue an inmate to restore discipline. *Rudlaff*, 791 F.3d at 643-44; *Hagans*, 695 F.3d at 509; *Caldwell*, 968 F.2d at 600-01.[12] And as noted above: the video evidence belies Hall's contention that the officers threw him to the ground or physically assaulted him after he reached the floor. In sum, Hall has not pointed to any legal rules that the officers' conducted violated, let alone any that were "clearly established."

---

[12] The Court is mindful that none of these cases involved a pretrial detainee, as Hall was in this case. They are mentioned here to highlight the gulf between the caselaw provided by defendants and the dearth of any relevant authority offered by Hall.

Hall has not shown that the individual defendants used any excessive force, and nor has he demonstrated that they violated any "clearly established" right. Accordingly, the individual defendants are entitled to qualified immunity on Count I and summary judgment is appropriately granted in their favor.

> B. *Because Hall has not demonstrated any underlying constitutional violation, the* Monell *claim in Count II is likewise subject to summary judgment.*

Because Hall has not shown any underlying constitutional violation, his *Monell* claim against Macomb County (Count II) also fails. *Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (there can be no *Monell* liability without an underlying constitutional violation).

> C. *Count II is independently subject to summary judgment because plaintiff has not identified any facts beyond his own case.*

Finally, defendants' opening brief argued that Hall could not identify any unconstitutional custom, policy, or practice that caused a violation of his rights. (ECF No. 22, PageID.136). Hall provided no evidence in response other than defendants' testimony that their use of force in this particular incident was "in line with Defendants' own policy." (ECF No. 25, PageID.530). But one case does not a custom make. *Thomas v. Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005) (plaintiffs cannot "infer a municipal-wide policy based solely on one instance of potential misconduct"). Count II is independently subject to summary judgment

because he has failed to identify any unconstitutional custom, policy or practice beyond the circumstances of his own case.

In conclusion, the individual defendants are entitled to qualified immunity on Hall's excessive force claim because he has not shown that the force used was excessive or unreasonable and nor has he demonstrated that the defendants violated any clearly established right.  His *Monell* claim against the County fails both because he has not identified any underlying constitutional violation and because he has not identified any relevant custom, practice or policy beyond the facts of his own case.  Summary judgment is thus appropriately granted in favor of defendants. Accordingly, it is hereby,

ORDERED that the defendants' motion for summary judgment (ECF No. 22) is GRANTED on all counts.

**SO ORDERED.**

<table>
<tr><td></td><td>s/Bernard A. Friedman</td></tr>
<tr><td>Dated: January 24, 2024</td><td>BERNARD A. FRIEDMAN</td></tr>
<tr><td>Detroit, Michigan</td><td>SENIOR U.S. DISTRICT JUDGE</td></tr>
</table>

26